USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/23/2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MASTERCARD INTERNATIONAL
INCORPORATED,

Plaintiff,

-against-

NIKE, INC., WILLIAM E. DENNINGS III, and RYAN
FUSSELMAN,

Defendants.

---

No. 15-cv-114 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff MasterCard International Incorporated ("Plaintiff" or "MasterCard") brings this

action alleging breach of contract, tortious interference, and unfair competition against

Defendants NIKE, Inc. ("NIKE"), William E. Dennings III ("Dennings"), and Ryan Fusselman

("Fusselman") (collectively, "Defendants"). Defendants move to dismiss Plaintiff's amended

complaint (ECF No. 13, or the "Amended Complaint") pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure. For the following reasons, Defendants' motion is DENIED in part and

GRANTED in part.

## BACKGROUND

The following facts are taken from the Amended Complaint unless otherwise noted and

are accepted as true for the purposes of this motion.

Dennings and Fusselman[1] are former employees of MasterCard[2] and currently work at

---

[1] Dennings and Fusselman are Oregon residents. (Am. Compl. ¶¶ 18–19.)

[2] MasterCard is a Delaware corporation with its principal place of business in New York. (*Id.* ¶ 16.)

NIKE.[3]  (Am. Compl. ¶ 1.)  Dennings was MasterCard's Chief Information Security ("IS")

Officer ("CISO") until May 28, 2013, and Fusselman was the Senior Business Leader in

MasterCard's IS department until October 11, 2013.  (*Id.* ¶¶ 2–3.)  Fusselman reported directly to

Dennings.  (*Id.* ¶ 34.)  Dennings and Fusselman had responsibility for managing MasterCard's

information security department, sequencing and carrying out initiatives to protect data,

identifying new personnel, and promoting existing personnel.  (*Id.* ¶ 30.)  They also received

confidential information about MasterCard's network configuration, as well as suppliers and

other persons engaged in business with MasterCard.  (*Id.* ¶ 31.)

As part of their employment with MasterCard, Dennings and Fusselman each signed a

Long Term Incentive Compensation Plan Agreement ("LTIP Agreement"), which contains,

among other things, restrictions regarding disclosure of MasterCard's confidential information

and solicitation of MasterCard's employees, consultants, suppliers, and other persons engaged in

business with MasterCard.  (*Id.* ¶ 4.)  Section 2 of Dennings' and Fusselman's LTIP Agreements

prohibit them from soliciting MasterCard employees, consultants, suppliers, and other persons

engaged in business with MasterCard for a 24-month period (Dennings)/12-month period

(Fusselman) following termination of their employment (the "Non-Solicitation Clause").  (*Id.* ¶¶

38, 40.)  Section 3 of Dennings' and Fusselman's LTIP Agreements prohibits them from

disclosing MasterCard's confidential information to NIKE (the "Non-Disclosure Clause").  (*Id.*

¶¶ 39–40.)  Section 5 of the LTIP Agreements provides that MasterCard is entitled to an

injunction to prevent breaches of the LTIP Agreement.  (*Id.* ¶ 42.)  Additionally, Dennings and

Fusselman certified that they would comply with MasterCard's Code of Conduct in the course of

their employment, which provides for non-disclosure of confidential information.  (*Id.* ¶ 43.)

---

[3] NIKE is an Oregon corporation with its principal place of business in Oregon.  (*Id.* ¶ 17.)

NIKE was aware of these provisions in the LTIP Agreements. (*Id*. ¶¶ 52, 68.)

The Amended Complaint alleges that, in recent years, there has been an increasing demand for IS personnel due to the rise in electronic storage and growing data security threats. (*Id*. ¶¶ 6–7.) Furthermore, there is a limited supply of skilled personnel available to perform IS job functions. (*Id*. ¶ 7.) The Amended Complaint further alleges that MasterCard's success is derived, in part, from its ability to provide a secure platform for customer information which it receives and transmits. (*Id*. ¶¶ 10–12.) As of 2013, MasterCard had a developed IS department,[4] whereas NIKE was looking to create such a department. (*Id*. ¶¶ 13–14.) According to the Amended Complaint, "[i]nformation security concerns the protection of data that companies store and transmit about customers, contracting parties and themselves." (*Id*. ¶ 5.) Prior to his departure from MasterCard, Dennings prepared a report on the retention and development of key talent in the IS department. (*Id*. ¶ 49.) Dennings resigned from MasterCard on or about May 28, 2013 and accepted a position with NIKE. (*Id*. ¶ 50.) Subsequently, Dennings solicited Fusselman to join NIKE, and Fusselman resigned from MasterCard and accepted a position with NIKE on October 11, 2013. (*Id*. ¶ 65.)

Dennings and Fusselman allegedly conspired to build NIKE's IS department by using confidential information from MasterCard about its employees and consultants and the configuration and software of MasterCard's network, as well as soliciting MasterCard's employees, consultants, suppliers, and others engaged in business with MasterCard. (*Id*. ¶ 14.) In particular, of the eleven employees of MasterCard's IS department that left their employ between May 2013 and September 2014, eight individuals joined NIKE's IS department. (*Id*. ¶ 28.) The Amended Complaint further alleges that Dennings and Fusselman used personal social

---

[4] *See* Paragraphs 24–27 of the Amended Complaint for further description of MasterCard's IS department.

media accounts, such as LinkedIn, and personal e-mails and cell phones to encourage

MasterCard employees to join NIKE.  (*Id.* ¶ 88.)

## STANDARD ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 566

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 566

U.S. at 678.  Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir.

2010).  A court should accept non-conclusory allegations in the complaint as true and draw all

reasonable inferences in the plaintiff's favor.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir.

2008).  "[T]he duty of a court 'is merely to assess the legal feasibility of the complaint, not to

assay the weight of the evidence which might be offered in support thereof.'"  *DiFolco v.

MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (quoting *Cooper v. Parsky,* 140 F.3d

433, 440 (2d Cir. 1998)).

When ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a

"court may consider the facts as asserted within the four corners of the complaint together with

the documents attached to the complaint as exhibits, and any documents incorporated in the

complaint by reference."  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57,

64 (2d Cir. 2010) (internal quotation marks and citation omitted).  Courts also may consider

4

"matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993). One way a document may be deemed incorporated by reference is where the complaint "refers to" the document. *EQT Infrastructure Ltd. v. Smith,* 861 F. Supp. 2d 220, 224 n.2 (S.D.N.Y. 2012).

## DISCUSSION

## I.      Breach of Contract[5]

Plaintiff's first cause of action against Defendants asserts that Dennings and Fusselman breached the LTIP Agreements and MasterCard's Code of Conduct by disclosing MasterCard's confidential information to NIKE and soliciting, or assisting NIKE to solicit, directly or indirectly, managers, employees, or suppliers of MasterCard and others engaged in business with MasterCard. (Am. Compl. ¶ 124–31.) Defendants advance three grounds for dismissal of the breach of contract claim: (1) the non-recruitment provision of the LTIP Agreements is unenforceable; (2) the Amended Complaint is devoid of well-pleaded facts regarding Dennings' and Fusselman's misuse of confidential information; and (3) the allegations regarding breaches of the Non-Solicitation Provision of the LTIP Agreements are conclusory. (Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("Defs.' Mot.") at 7–16.) The Court will address the merits of each of Defendants' arguments in turn.

### A.  Enforceability of Non-Recruitment Provision

Both Dennings' and Fusselman's LTIP Agreements contain a provision that prohibits them from "directly or indirectly, solicit[ing], induc[ing], recruit[ing], or encourag[ing] any other employee, agent, consultant or representative to leave the service of [MasterCard] for any reason

---

[5] The parties do not dispute that New York law applies to Plaintiff's breach of contract claim.

. . . " for a period of 24 months (Dennings) or 12 months (Fusselman) following termination of their employment (the "Non-Recruitment Provision").  (Am. Compl. ¶¶ 38, 40.)  In examining whether Plaintiff may maintain a valid breach of contract claim as to the Non-Recruitment Provision, this Court first must determine whether the Non-Recruitment Provision qualifies as a restrictive covenant or is subject to a less stringent level of scrutiny.  Then, the Court will apply the appropriate analysis to determine if the Non-Recruitment Provision is enforceable.

### i.      Applicable Inquiry

As an initial matter, the parties appear to disagree as to whether the Non-Recruitment Provision qualifies as a restrictive covenant, which dictates the nature of this Court's inquiry into the enforceability of the provision.  Plaintiff contends that non-recruitment provisions are distinct from non-compete provisions, which are considered restrictive covenants, because non-recruitment provisions do not impede an employee's "ability to earn a livelihood or otherwise interfere with her or his mobility."  (Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.'s Opp.") at 13.)  Consequently, Plaintiff argues that the enforceability of a non-recruitment provision is governed by general contract principles.  (*Id*. at 16.)  Defendants argue that prevailing New York law draws no distinction between non-recruitment and non-compete provisions.  (Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("Reply") at 2.)  Therefore, Defendants contend, the Non-Recruitment Provision should be subject to the reasonableness standard adopted by the New York Court of Appeals in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 712 N.E.2d 1220 (N.Y. 1999). (Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("Defs.' Mot.") at 7.)

This Court is persuaded that the reasonableness test set forth in *BDO Seidman* applies to non-recruitment provisions.  Admittedly, the contract provision before the court in *BDO Seidman* was a non-compete clause; nevertheless, in analyzing such a provision, the New York Court of Appeals broadly noted that "ancillary employee anti-competitive agreement[s]" should "be carefully scrutinized by the courts."  93 N.Y.2d at 388 (citing *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496, 499 (N.Y. 1977)).  At least one other court in this Circuit also has concluded that the three-prong *BDO Seidman* test applies with equal force to non-recruitment provisions.  In *Reed Elsevier Inc. v. Transunion Holding Company*, the court noted that "[c]ourts applying New York law have observed that there is a dearth of case law addressing no-hire provisions, and consequently apply the same three-prong analysis applied to non-compete clauses to determine the reasonableness of no-hire provisions."  No. 13-cv-8739 (PKC), 2014 WL 97317, at *7 (S.D.N.Y. Jan. 19, 2014) (citing *Evolution Mkts., Inc. v. Penny,* No. 7823/09, 2009 N.Y. Misc. LEXIS 1276, at *7–8 (Sup. Ct., Westchester Cnty. 2009) ("There appears to be no New York Court of Appeals case discussing the applicable standard for non-recruitment covenants. In fact, both parties can point to only one New York case discussing the standard."); *OTG Mgmt., LLC v. Konstantinidis,* 40 Misc.3d 617, 967 N.Y.S.2d 823, 826 (N.Y. Sup. Ct. 2013) (noting a lack of precedent governing no-hire provisions and applying the three-prong reasonableness test to a non-recruitment agreement)).  Additionally, at least one New York trial court has held that the *BDO Seidman* test applies to non-solicitation clauses.  *See Lazer Inc. v. Kesselring*, 13 Misc. 3d 427, 431, 823 N.Y.S.2d 834 (N.Y. Sup. Ct. 2005) (holding that "a covenant not to solicit former coemployees is a species, albeit a limited one, of a covenant not to compete in the broad sense and is governed by the three-part test of reasonableness articulated in *BDO Seidman*.")  The court in *Lazer* noted that a non-solicitation agreement "restricting as it

does a former employee's freedom to solicit his former coemployees, necessarily also affects the general competitive mold of society, and is in derogation of the concept, invoked in the cases on this subject, that our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas." *Id.*

Plaintiff lodges a series of unpersuasive challenges to the *Lazer* court's determination that the *BDO Seidman* test applies to nonrecruitment provisions. First, Plaintiff contends that *Lazer* is distinguishable because it arose in the context of a motion for summary judgment. (Pl.'s Opp. at 14.) However, the procedural posture of the case did not affect the court's determination of the nature of the reasonableness inquiry, only the ultimate application of the *BDO Seidman* reasonableness inquiry. Second, Plaintiff argues that the *Lazer* court ignored the unique policy considerations of non-compete clauses inapplicable to non-recruitment provisions. (Pl.'s Opp. at 13–16.) In particular, Plaintiff notes that non-recruitment provisions are subject to greater scrutiny because that type of post-employment restriction may contribute to "loss of a man's livelihood." *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 272 (N.Y. 1963). This Court agrees that non-recruitment provisions are "inherently more reasonable and less restrictive than non-complete clauses." *Admarketplace Inc. v. Salzman*, 2014 N.Y. Misc. LEXIS 1458, at *10 (N.Y. Sup. Ct. Mar. 28, 2014) (internal quotations and citations omitted). This is because a non-recruitment provision does not impede an individual's ability to procure new employment. Nevertheless, a non-recruitment provision still operates as an anti-competitive agreement and warrants judicial scrutiny beyond general contract principles. Third, Plaintiff asserts that the *Lazer* court mis-cited a New Hampshire Supreme Court decision cited in *BDO Seidman*— *Technical Aid Corporation v. Allen*, 134 N.H. 1 (N.H. 1991) ("*Technical Aid*"). (Pl.'s Opp. at 15.) In particular, Plaintiff argues that the *Lazer* court "confused the New Hampshire Supreme

Court's discussion of a provision restricting solicitation of customers (which is a form of non-compete) with a non-recruitment of employees provision." (*Id.*) However, it appears that the New Hampshire court in *Technical Aid* did engage in a three prong analysis, or at least some version of it, for a non-recruitment provision. 134 N.H. at 13–14 (holding that the 18-month non-recruitment restrictment was not excessive in light of the "legitimate interest in retaining the services of [ ] current employees . . . .") Finally, Plaintiff seeks to distinguish the non-recruitment provision in *Lazer*, which was enacted "only in conjunction with the nondisclosure of proprietary information provisions . . . and the noncompetition provisions," and the Non-Recruitment Provision. 13 Misc. 3d at 429. However, the *Lazer* court explicitly noted that even if the nonrecruitment provision were construed as a standalone covenant, it would still be unenforceable in New York. *Id.*

### ii.    Application of *BDO Seidman* Test

Having determined that the Non-Recruitment Provision is subject to the *BDO Seidman* test, the Court next turns to an application of that test to determine whether the provision is enforceable. In *BDO Seidman*, the New York Court of Appeals adopted a three-part test to determine the reasonableness, and ultimately the enforceability, of anti-competitive employee agreements. *BDO Seidman*, 93 N.Y.2d at 388–89. "A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* Courts also typically examine whether the restriction is limited in time and geographic scope to assess reasonableness. *Id.* "A violation of any prong renders the covenant invalid." *Id.* "Under New York law, determination of the enforceability of a restrictive covenant focuses on the particular

facts and circumstances giving context to the agreement." *Reed Elsevier*, 2014 WL 97317, at *7 (internal quotation and citation omitted).

In the instant case, Plaintiff concedes that there is no geographic limitation on the Non-Recruitment Provision. Nevertheless, "where an employer's business is conducted worldwide to a global customer base, 'the lack of a geographic restriction is necessary.'" *Reed Elsevier*, 2014 WL 97317, at *7 (quoting *Evolution Mkts., Inc. v. Penny*, No. 7823/09, 2009 N.Y. Misc. LEXIS 1276, at *44 (N.Y. Sup. Ct. 2009)). Furthermore, New York courts have upheld as reasonable one year and two year non-solicitation provisions, like Dennings' and Fusselman's Non-Recruitment Provisions. *See Silipos, Inc. v. Bickel*, No. 06-cv-2205, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006) (citing *Crown It Servs. Inc. v. Koval-Olsen*, 782 N.Y.S.2d 708, 710 (1st Dep't 2004) (one-year restriction); *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 201, 651 N.Y.S.2d 504, 505 (1st Dep't 1996) (two-year restriction)). Thus, the Court cannot conclude that the geographic and temporal scope of the Non-Recruitment Provision are unreasonable.

Courts in New York have determined interests to be legitimate in the context of ancillary employee anti-competitive agreements when they are designed "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases were the employee's services to the employer are deemed special or unique." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999) (citing *Purchasing Assocs.*, 13 N.Y.2d at 272–73). Plaintiff contends that the Non-Recruitment Provision protects the following "legitimate interests": (1) MasterCard's goodwill, (2) MasterCard's confidential information, (3) MasterCard's "investments in developing and retaining highly qualified employees in ISD and related departments," (4)

MasterCard's investments in its network, (5) MasterCard's business relationships, (6) "maintenance of a highly qualified and specialized ISD," and (7) employee productivity and morale.  (Pl.'s Opp. at 17) (citing Am. Compl. ¶¶ 4–13, 44–45.)  While the Court is skeptical as to whether all of these interests qualify as legitimate, Plaintiff's assertion that the Non-Recruitment Provision is designed to prevent competitors from poaching employees from MasterCard's highly developed IS department as well as protect against the misappropriation of MasterCard's proprietary IS network coincides with the legitimate interests recognized by courts in New York.  *See Admarketplace*, 2014 N.Y. Misc. LEXIS 1458, at *10 ("The gravamen of [plaintiff's] allegations is that [defendant] has been poaching employees from [plaintiff], inducing them to switch companies for greater compensation hoping that [they] bring proprietary information with them.  A non-recruitment prohibition directly guts this channel of wrongful competition.").  Of course, the merit of Plaintiff's allegations that NIKE was attempting to poach MasterCard's employees in the hopes of replicating MasterCard's developed IS network will be borne out in discovery.

Additionally, given the limited time frame of the Non-Recruitment Provision, the Court cannot conclude that the Non-Recruitment Provision is unenforceable on undue hardship grounds at this juncture.  *See Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239, at *18 (S.D.N.Y. Oct. 31, 2008).

Finally, Defendants contend the Non-Recruitment Provision is injurious to the public at large, and therefore unenforceable, because it "has the effect of preventing MasterCard employees who are not subject to restrictive covenants from learning of opportunities in the economy that may be able to use their services . . . ."  (Defs.' Mot. at 12, n. 7.)  However, the Non-Recruitment Provision merely forecloses one potential avenue for MasterCard employees to

learn about job opportunities and only for a limited time frame.  MasterCard employees are free

to pursue employment at other companies—the Non-Recruitment Provision merely limits the

ability of former employees to assist NIKE to poach employees for a specified period.

MasterCard employees are even free to pursue employment at NIKE—the Non-Recruitment

Provision just limits one means of learning about potential employment opportunities at NIKE.

The Court is not persuaded that such a prohibition is injurious to the public at large.

Accordingly, the Court finds that the Non-Recruitment Provision is enforceable at this

stage of the litigation and declines to dismiss Plaintiff's breach of contract claim with respect to

the Non-Recruitment Provision.

### B. Confidentiality Provision

The Court next turns to Plaintiff's claim that Defendants breached the Confidentiality

Provision in the LTIP Agreement.  The LTIP Agreement prohibits direct or indirect disclosure of

"Confidential Information," which is defined in the LTIP Agreement as information that is of a

"confidential, competitively sensitive, proprietary and/or secret character and is not generally

available to the public."  (Declaration of David W. Garland ("Garland Decl."), Exhibit 2 at 3.)

Defendants attack Plaintiff's breach of contract claim with respect to the Confidentiality

Provision on two primary grounds: (1) Plaintiff fails to establish that basic information regarding

employees is "confidential" and (2) allegations in the Amended Complaint regarding alleged

disclosure and misappropriation of Confidential Information that are made "on information and

belief" are insufficient to withstand a motion to dismiss.  (Defs.' Mot. at 13–14.)

The Amended Complaint alleges that information concerning the compensation,

capabilities and performance of MasterCard's employees, as well as information regarding

MasterCard's network configuration, is confidential, competitively sensitive, and not generally

available to the public.  (Pl.'s Opp. at 11 (citing Am. Compl. ¶¶ 31, 39, 41, 47–50).)  Defendants

appear to suggest that because certain MasterCard employees had LinkedIn profiles that publicly

display information regarding their expertise and capabilities, the alleged Confidential

Information described in the Amended Complaint is not in fact confidential.  However,

"[w]hether the information at issue is actually either proprietary or confidential is a factual

determination which cannot be made" at the motion to dismiss stage.  *Trusthouse Forte, Inc. v.*

*795 Fifth Ave. Corp.*, No. 08-cv-1698 (CBM), 1981 WL 1113, at *5 (S.D.N.Y. Aug. 31, 1981).

        Defendants further challenge Plaintiff's claim that Defendants breached the

Confidentiality Provision on the basis that the "information and belief" allegations in the

Amended Complaint are improper.  In particular, Defendants cite *JBC Holdings NY, LLC, v.*

*Pakter* for the proposition that "information and belief" allegations must be "accompanied by a

statement of the facts upon which the belief is founded."  (Defs.' Mot. at 14 (citing 931 F. Supp.

2d 514, 527 (S.D.N.Y. 2013) (internal citation and quotation omitted)).  They further argue that

the allegations are entirely conclusory rather than proper factual allegations.  (Defs.' Mot. at 14.)

Plaintiff counters that *Barrett v. Forest Laboratories, Inc.*, a subsequent case from this district,

clarified that the *JBC* court's holding was limited to Rule 9(b)'s heightened pleading standard.

(Pl.'s Opp. at 9 (citing 39 F. Supp. 3d 407, 432–33 (S.D.N.Y. 2014)).

        "Deciding the plausibility of a complaint is, of course, a 'context-specific task.'" *Barrett*,

39 F. Supp. 3d at 432 (quoting *Iqbal,* 556 U.S. at 679).  The Amended Complaint alleges, upon

information and belief, that Defendants reconfigured NIKE's network to resemble MasterCard's

network using MasterCard's Confidential Information, which Dennings and Fusselman were

privy to in their previous positions within the IS department at MasterCard (Am. Compl. ¶¶ 55,

56, 69); Defendants used MasterCard's Confidential Information to reconfigure NIKE's network

13

because doing so was less expensive than developing its own system from scratch (*Id.* ¶ 57); and Dennings disclosed Confidential Information concerning Fusselman and MasterCard's network configuration to solicit Fusselman (*Id.* ¶ 64).  The Court finds that these allegations are sufficient to state a claim under the *Twombly*/*Iqbal* standards.  "Both *Twombly* and *Iqbal* recognize that, on a motion to dismiss, courts must assume as true the factual allegations in a complaint."  *Barrett*, 39 F. Supp. 3d at 432 (citations omitted).  At this stage of the litigation, Plaintiff has alleged sufficiently a breach of the Confidentiality Provision.  *See KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 372 (S.D.N.Y. 2014) (upholding plaintiff's misappropriation of confidential information claim at motion to dismiss stage).  The Court notes that to the extent discovery does not substantiate Plaintiff's allegations, this claim may be properly dismissed at the summary judgment stage.

### C.  Non-Solicitation Provision

Defendants' argument regarding Plaintiff's claim that Defendants breached the Non-Solicitation Provision closely tracks their attack on Plaintiff's claim premised upon a breach of the Confidentiality Provision.  In particular, Defendants contend that the Amended Complaint fails to identify MasterCard's suppliers that Defendants allegedly solicited and fails to allege how NIKE diverted those suppliers' resources from MasterCard.  (Defs.' Mot. at 16.)  However, the Amended Complaint alleges that Dennings' responsibilities at NIKE include developing relationships with suppliers for NIKE's IS department (Am. Compl. ¶ 53), and Defendants induced suppliers and others engaged in business with MasterCard to divert resources from MasterCard to NIKE (*Id.* ¶¶ 55–57, 69, 89).  While the Amended Complaint does not state the identity of these suppliers, the Court notes that such level of specificity is not required at this stage of the litigation.  Moreover, the Court is not persuaded by Defendants' argument that NIKE

could not have breached the Non-Solicitation Provision because MasterCard and NIKE are not competitors.  (Defs.' Mot. at 15–16.)  MasterCard and NIKE are engaged in different businesses (Am. Compl. ¶¶ 10, 14); nevertheless, the Amended Complaint alleges that the two companies compete for limited resources and personnel in the IS realm.  (*Id.* ¶¶ 5–14, 140.)  Accordingly, the Court declines to dismiss Plaintiff's claim for breach of the Non-Solicitation Provision.

## II.   Tortious Interference

The Court next turns to Plaintiff's claim for tortious interference with contract.  As an initial matter, the parties dispute which states' law governs the tortious interference claim. Defendants assert that Oregon law should apply.  (Defs.' Mot. at 19–20.)  Plaintiffs, on the other hand, argue that New York law applies.  (Pl.'s Opp. at 18.)  Prior to examining the substantive merits of Plaintiff's tortious interference claim, the Court will first determine the applicable law.

### A.  Choice of Law Analysis

"When a federal district court sits in diversity, it generally applies the law of the state in which it sits, including that state's choice of law rules." *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012). This Court is sitting in diversity in New York, which only requires a court to undergo a conflict of laws analysis if there is indeed a conflict.  *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 233, 597 N.Y.S.2d 904, 613 N.E.2d 936 (N.Y. 1993)).  "Laws are in conflict '[w]here the applicable law from each jurisdiction provides different substantive rules.'"  *Int'l Bus. Machines Corp.*, 363 F.3d at 143 (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998)).  "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply

it." *Int'l Bus. Machines Corp.*, 363 F.3d at 143 (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426, 647 N.Y.S.2d 8 (N.Y. App. Div. 1996)).

New York draws a distinction between tortious interference with a contract and tortious interference with a nonbinding economic relation. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 818 N.E.2d 1100 (N.Y. 2004). Whereas a plaintiff may recover damages for tortious interference with contract "even if the defendant was engaged in lawful behavior," tortious interference with prospective business relations requires a showing of "more culpable conduct on the part of the defendant." *Id.* at 189–90. Oregon, on the other hand, requires a showing of "improper purpose" even for cases alleging tortious interference with contract. *Douglas Med. Ctr. LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 630, 125 P.3d 1281, 1287 (Or. Ct. App. 2006). Missouri similarly requires a showing of "improper means" for all tortious interference cases. *EnviroPak Corp. v. Zenfinity Capital, LLC*, No. 04:14-cv-00754, 2015 U.S. Dist. LEXIS 7770, at *19 (E.D. Mo. Jan. 23, 2015) (citing *Clinch v. Heartland Health*, 187 S.W.3d 10, 16 (Mo. App. W.D. 2006) (citing *Carter v. St. John's Reg'l Med. Ctr.*, 88 S.W.3d 1, 14 (Mo. App. S.D. 2002)). Given the discrepancy between New York and Oregon/Missouri law regarding the requisite elements to plead tortious interference with contract, the Court must undertake a choice of law analysis.

New York's choice-of-law principles dictate that the law of the jurisdiction "'with the most significant interest in, or relationship to, the dispute'" applies. *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)). This "interests" analysis requires an evaluation of both "the significant contacts" and the location of those contacts as well as "whether the purpose of the law is to regulate conduct or allocate loss." *Krock v. Lipsay*, 97 F.3d

640, 645 (2d Cir. 1996).  The parties' domiciles and locus of the tort generally comprise the

significant contacts.  *Id.* at 646.  Furthermore, "[t]he respective importance of each of those

contacts is determined by the nature of the law in question."  *Id*.  Where, as here, the applicable

laws are conducting regulating, "the locus of the tort will almost always be determinative . . . ."

*Id*. (internal citations and quotations omitted).  The New York Court of Appeals has "held that

where negligent conduct occurs in one jurisdiction but the plaintiff's injuries are suffered in

another, the situs of the tort is where the last event necessary for liability occurred.  *White Plains*

*Coat & Apron*, 460 F.3d at 285 (citing *Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 195, 480

N.E.2d 679, 491, N.Y.S.2d 90 (1985)).  "However, this last place criterion is not chiseled in

stone, but rather gives way when it is at war with state interests so that the more general

principles of interest analysis apply."  *Planet Payment, Inc. v. Nova Info. Sys.*, 2011 U.S. Dist.

LEXIS 49154, at *26 (E.D.N.Y. Mar. 31, 2011) (internal quotations omitted).  "[W]here one

state's relationship to the conduct at issue overwhelmed the interest of the state where the

damage occurred, courts have declined to apply the last event necessary test."  *Id*. at 26–27

(collecting cases).

      In the instant action, Plaintiff's domicile is New York, whereas Defendants are domiciled

in Oregon.  Additionally, the locus of the tort—"the place where the alleged injury is

inflicted"—is New York because Plaintiff is domiciled in New York.  *Mark Andrew of the Palm*

*Beaches, Ltd. v. GMAC Commercial Mortg. Corp.*, 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003).

Nevertheless, the Court finds it appropriate to deviate from the "last place criterion" because

Oregon has a much greater relationship to the conduct at issue.  The individual defendants are

domiciled in Oregon; NIKE is incorporated and headquartered in Oregon; and the former

MasterCard employees that Plaintiff alleges Defendants solicited were hired to work in Oregon.

(Reply at 7.)  New York's sole relation to the action is that MasterCard is domiciled there. Therefore, Oregon law applies to the evaluation of Plaintiff's tortious interference claim.

### B.  Merits of Claim

As stated above, to sufficiently state a claim for tortious interference under Oregon law, a plaintiff must allege that the defendant acted with an improper purpose or through improper means.  Defendants contend that Plaintiff's claim fails because the Amended Complaint does not suggest that Defendants "were acting only to inflict harm upon MasterCard."  (Defs.' Mot. at 21.)  Under Oregon law, "[d]eliberate interference alone does not give rise to tort liability." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498, 982 P.2d 1117, 1124 (1999).  "To be entitled to reach a jury, a plaintiff must not only prove 'that defendant intentionally interfered with his business relationship but also that defendant had a duty of non-interference; *i.e.*, that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means which resulted in injury to plaintiff.'"  *Id.* (quoting *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371 (1979)).  "The burden of proof rests with a plaintiff to show both that a defendant intentionally interfered with the plaintiff's economic relationship and that the defendant had no privilege to do so."  *Chase Gardens*, 328 Or. At 498-99 (citation omitted).

Here, the Amended Complaint alleged that Defendants acted both with an improper purpose and through improper means.  First, the Amended Complaint states that NIKE, in apparent recognition of limited IS personnel and resources, solicited MasterCard's former employees and other business contacts to develop its own IS department at the expense of MasterCard.  The Amended Complaint further alleges that in doing so, NIKE caused MasterCard's former employees to violate their LTIP Agreements, which contain prohibitions

18

against solicitation of MasterCard business contacts, recruitment of MasterCard employees, and misappropriation of MasterCard Confidential Information.  Allegedly, NIKE was aware of these provisions in the LTIP Agreements.  (Am. Compl. ¶¶ 52, 68.)  At the motion to dismiss stage, Plaintiff has alleged sufficiently that Defendants acted with an improper purpose or through improper means with respect to the tortious interference claim.  Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's tortious interference claim.

### III.    Unfair Competition

As with the tortious interference claim, the parties appear to dispute which state's law is applicable to the unfair competition claim.  Defendants contend that Oregon law applies (Defs.' Mot. at 24), whereas Plaintiff asserts that New York law applies.  (Pl.'s Opp. at 22.)  First, the Court must ascertain whether there is a difference between Oregon and New York law with respect to unfair competition.  If there is a difference, the Court will conduct an interests analysis to determine which state's law applies.

Under Oregon law, a claim for unfair competition is preempted by Oregon's Trade Secrets Act ("OUTSA") when it "rests primarily in Defendants' alleged misappropriation of trade secrets."  *Precision Automation, Inc. v. Tech. Servs.*, 2007 U.S. Dist. LEXIS 94555, at *7 (D. Or. Dec. 14, 2007).  Plaintiff's unfair competition claim alleges that Defendants misappropriated Plaintiff's "Confidential Information, skills, expenditures and labors of MasterCard" (Am. Compl. ¶ 143) as well as poached MasterCard's employees.  (*Id.* ¶ 144.) While the latter allegation does not appear on its face to constitute a misappropriation of a trade secret, a federal court applying Oregon law has acknowledged that a similar allegation "is clearly encompassed by OUTSA's broad prohibition of any 'improper acquisition, disclosure or use of a trade secret.'"  *Vigilante.com, Inc. v. ArgusTest.com, Inc.*, 2005 U.S. Dist. LEXIS 45999, at *39

19

(D. Or. Sept. 6, 2005).  Therefore, if analyzed under Oregon law, Plaintiff's unfair competition claim would be preempted by the OUTSA, which requires "a plaintiff to demonstrate that: (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation."  *Id*. at 38 (internal quotation and citation omitted).

To sustain an unfair competition claim under the misappropriation theory in New York,[6] a plaintiff "must show that the defendants misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so."  *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 325 (S.D.N.Y. 2012) (citations and quotations omitted).  Given the conflict between Oregon and New York law with respect to unfair competition claims, the Court must conduct an interests analysis to determine which state's law controls.  Because unfair competition is a conduct-centered claim like tortious interference, the Court concludes that Oregon law applies for the reasons stated in Section II.A *supra*.

The Amended Complaint does not allege the elements of an OUTSA claim.  Accordingly, Plaintiff's unfair competition claim is dismissed without prejudice.

---

[6] New York also recognizes the "palming off" theory of an unfair competition claim, which occurs in the context one manufacturer passing off another's goods as his own.  *See ITC Ltd. v. Punchgini, Inc.,* 9 N.Y.3d 467, 850 N.Y.S.2d 366, 880 N.E.2d 852, 858 (2007).

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss Plaintiff's breach of contract and tortious interference claim.  Additionally, the unfair competition claim is dismissed without prejudice.  Defendants are directed to file answers within 30 days hereof.  The parties are directed to appear for an initial pre-trial conference on April 15, 2016 at 12:00 p.m. Parties shall bring a completed case management plan to the initial pre-trial conference.  The Court respectfully directs the Clerk to terminate the motion at ECF No. 14.

Dated:    February 23, 2016                         SO ORDERED:
          White Plains, New York

                                          _____
                                          NELSON S. ROMÁN
                                          United States District Judge